UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| SAMUEL MANNING, | ) |
| | ) |
| Movant, | ) |
| | ) Civil No. 4:13CV_____ |
| v. | ) Case No. 4:07CR81-JBF-DEM-2 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## MOVANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

COMES Movant, SAMUEL MANNING ("Manning"), appearing *pro se*, and in support of his Motion would show as follows:

## I. JURISDICTION

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 2255. Manning is timely files his Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion") contemporaneously with this Memorandum of Law. Jurisdiction is vested in this District Court that presided over and imposed sentence pursuant to Rule 4(a) of the Rules Governing §2255 Proceedings. See *Liteky v. United States*, 510 U. S. 540,562 (1994).

## II. STATEMENT OF THE GROUNDS FOR RELIEF

A.    Whether in light of *Lafler v. Cooper*, 132 S. Ct. 136 (2012), Manning's attorney was ineffective and his pretrial representation fell below the wide range of professional competence demanded by the Sixth Amendment by failing to attempt to negotiate a reasonable Plea Agreement which would have avoided Manning receiving a life sentence.

B.    Whether trial counsel provided ineffective assistance of counsel by moving the Court to substitute additional peremptory challenges during *voir dire* in exchange for Manning's silence concerning his State trial in which he was acquitted for murder and for which was being retried by this instant matter.

C.    Whether the District Court erred by ordering that the defense would be allowed additional peremptory challenges in exchange for Manning's silence concerning his State trial in which he was acquitted for the same murder which was retried in this instant matter.

## III. STATEMENT OF THE CASE

A.   Relevant Course of Proceedings and Disposition Below

On August 14, 2007, a Superseding Indictment was returned by a federal grand jury charging Manning, with Conspiracy to Distribute Cocaine Base, in violation of 21 U.S.C 846; Use of a Firearm in Furtherance of a Drug Trafficking Crime Causing the Death of another, in violation of 18 U. S. C 924 (j) and Use of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U. S. C. 924(c). Doc. 3.[1]

On July 15, 2010, the government filed a Motion In Limine to prohibit reference resulting in his acquittal in state court for the murder of Donald Smith ("Smith"). Doc. 104. On July 19, 2010 Manning filed a motion in opposition to the government's Motion in Limine stating that the motion had been untimely filed and had requested an overly-broad remedy that was not necessary to adequately address the potential prejudice to either party, which could have resulted from a reference to the prior trial or acquittal. Doc. 138. Manning argued that the preclusion of any and all reference to Manning's 2006 state trial and acquittal

---

[1]

"Doc" refers to the Docket Report in the United States District Court for the Eastern District of Virginia, Newport News Division in Criminal Number in 4:07CR81-2, which is immediately followed by the Docket Entry Number. "JA" refers to the Joint Appendix from the Fourth Circuit USCA No. 11-4588, which is immediately followed by the Page Number.

would present insurmountable obstacles for his defense and would infringe his Constitutional Rights. According to the list of potential witnesses the government intended to call in was the case-in-chief of the state trial. Also, the government intended to call in to testify, either initially and/or on rebuttal, a list of witnesses which was inclusive of several people who were likely known by the Commonwealth to have been present at the shooting while the former case was being prosecuted by the state.

In response to the matters referenced above, Manning filed a Motion for Additional Peremptory Challenges pursuant to Federal Rule of Criminal Procedure 24 and Local Rule 24 on January 24, 2011. Doc. 138. In that motion, Manning averred that most of the government's witnesses were testifying pursuant to plea agreements and/or have been granted immunity for their testimony. *Id.* He further noted that the fact that each defendant would likely be raising separate issues and distinct legal and factual defense to the present charges, as well as the nature of the charges. *Id.* In its ruling the Court granted an additional five (5) peremptory challenges thus allowing a total of fifteen (15) for each defendant on Feb. 01, 2011. Doc. 142.

On January 27, 2011, The Government filed a Motion In Limine to Introduce Defendant's admission in Prior Statement of Facts in order to attempt to

prevent Manning from presenting contrary evidence. Doc. 141   The government, upon information and belief, stated that the Manning would attempt to offer evidence at trial that the murder for which he has been charged had been committed by Kasine Powers. which was in conflict with an admission made by Manning in the aforementioned Statement of Facts. *Id.*

On February 3, 2011, Manning responded to the motion. Doc 143.

On February 07, 2011, Jury Trial commenced and lasted until February 17, 2011. Docs. 150-159. At that time, the jury returned a guilty verdict on counts 1s, 2s, and 3s as to Manning. Doc. 160.

On May 24, 2011, Manning was sentenced to life imprisonment, 8 years Supervised Relief, Restitution of $2,072.15, no fine and a $300 Mandatory Special Assessment Fee. Doc. 168.

On May 26, 2011, Manning timely filed a Notice of Appeal. Doc. 169.

On January 20, 2012, the USCA affirmed the judgment of the District Court. Doc 196.  The Appeals Court denied the Petition for re-hearing on March 16, 2012. Doc. 199.

Manning filed a Petition for Writ of Certiorari in the United States Supreme Court (No. 11-10847) and said petition was denied on October 1, 2012.

B.     Statement of the Relevant Facts

On February 7, 2011. Manning proceeded to trial. In the course of trial, the government produced fourteen (14) witnesses and numerous exhibits. The evidence revealed that the defendant engaged in a drug relationship with Donald Smith ("Smith") and Michael Guess ("Guess") in 2001.

At Manning's trial, the United States presented several law enforcement agents as well as seven "civilian" witnesses who purportedly had knowledge relating to the crimes alleged in the Indictment. Six of the seven civilian witnesses were convicted felons serving prison time for drug trafficking and gun crimes, and five were convicted members of the Powers Conspiracy. These six witnesses were all testifying pursuant to plea agreements with the United States in the hope of receiving a cut on their lengthy prison sentences. Prior to the debriefings provided in connection with their plea agreements, none of the six witnesses had ever mentioned anything to any law enforcement agent regarding their supposed knowledge of the facts and circumstances relating to the crimes charged in the Indictment. JA 249, 264, 270, 277-282, 304, 309, 357, 375, 459, 484, 495, 503.

Guess testified that he bought drugs from Smith, and that he first met Smith in 1998. (JA 251). He met Smith in the area of 76th Street in Hampton, Virginia, which was the area where Guess sold drugs. *Id.* Guess identified Manning and

indicated that he knew him from their time in Bethel High School, around 1996. (JA 252).

Guess' drug relationship with Smith began in 2000 or 2001. Smith sold crack cocaine to Guess, who would buy anywhere from an eight ball (3.5 grams) to half an ounce from Smith. (JA 252, 253). Guess described the appearance of crack cocaine, how it could be broken down for resale, and the particular Speedy Mart on 76th Street in Hampton where he spent a good deal of time. (JA 254). In 2000 or 2001, Guess introduced the defendant to Smith for the purpose of Guess and the defendant buying crack cocaine from Smith. (JA 255, 256). Guess also indicated that the defendant spent time at an apartment known as "Pops' crib." (JA 257).Guess further provided that in 2001, Manning and Smith had a disagreement over the defendant owing Smith about a hundred dollars for a "cocaine debt." (JA 257, 258). Manning allegedly refused to pay Smith for the fronted crack cocaine after he saw Smith accompanied by another individual with which the Manning had problems. (JA 258).

Antwan Clements ("Clements") was another friend of Manning and a witness to his drug dealings and later the murder of Smith. He testified that he was selling crack cocaine in the 76th Street area in 2001 and 2002 and that he observed Manning selling crack cocaine on various occasions during this time period. (JA

310, 311). Clements further stated that he, Manning and others would hand out drugs at the apartment of an older guy called Pops, who smoked crack cocaine. (JA 313). Clements would give Pops crack cocaine in exchange for spending time in his apartment. *Id.* At times, Manning would have a firearm when he was selling crack cocaine. (JA 314).

Unlike Manning and Guess, Clements did not get crack cocaine from Smith; however, he knew that Smith was a source of supply for Manning and that the defendant bought drugs from Smith on consignment. (JA 315, 317).

Clements also knew that Manning allegedly owed Smith money for drugs that had been fronted to him. (JA 318).

Mister Jones ("Jones"), another friend and associate, also testified to his relationship with Manning, Foster, Guess and Clements. Jones indicated that during the 2000-2002 time period, he would hang out with these individuals in the 76th Street area and also at Pops' apartment. (JA 463, 465).

Following a number of transactions where Smith would allegedly front Manning and Guess crack cocaine for further sale, a dispute arose between Manning and Smith wherein Manning allegedly refused to pay Smith for a fronted quantity of crack cocaine.

On October 17, 2002, following Manning's dispute with Smith, the two men were involved with a shoot out Hampton, Virginia, near the same Speedy Mart where Guess and Manning sold drugs. (JA 289). Twelve bullet casings were recovered by police following the shooting. (JA 291). Brandon Foster ("Foster"), an acquaintance of Manning, testified that he knew the defendant and that they hung out together on 76th Street in Hampton. (JA 271, 272). Foster witnessed the 2002 shooting involving Manning while he was with Jones. (JA 273). Foster knew that Manning had a conflict with another individual, in which he was behind on payments for drugs. (JA 274). Manning also told Foster that he had a gun. *Id.*

Foster observed the shooting that occurred when the other individual got out of a car and approached on foot. Manning was shot in the left leg as part of the exchange of gunfire. (JA 275, 294). He was then carried away to Pops' apartment. (JA 276).

Following the shooting, Manning was taken to a hospital where he called Clements to try and have Clements pick him up from the hospital before the police could get there. (JA 320). Regarding this shooting, Manning later told Clements that he was standing in front of the Speedy Mart when he saw Smith and another man walking up from an apartment complex. (JA 320). Manning told Clements that when he saw Smith, he turned around and started shooting. (JA 321).

9

Manning was then hit in the leg and dropped the gun. Clements knew that Manning was using a P89 Ruger because he had previously brought Manning the gun. Manning allegedly told Clements that he was not going to pay the debt he owed to Smith. (JA 322).

Jones also knew that Manning was having an argument with Smith because he owed Smith money for drugs. (JA 467). Manning allegedly told Jones that he would not pay Smith for the drugs. *Id.* Jones also was present for the 76th Street shootout in 2002. He saw Smith and Manning have a conversation.

Manning then approached Jones and said Smith had asked about the money, but that he was not going to pay him. (JA 468). Jones indicated that Foster was standing with them. Jones knew that Manning had a gun that Clements had dropped off for him. (JA 470). Jones told Manning that Smith was again approaching, and Manning turned and began shooting at him. Smith returned fired and shot him in the leg. (JA 472). Manning allegedly later told Jones that he planned to kill Smith. (JA 474).

On October 9, 2003, the defendant was driving a gray Lincoln Town car through Newport News, Virginia. (JA 297). As a result of non-functioning taillights, Officer Steven Smithley of the Newport News Police Department made a traffic stop.

Manning and another occupant of the vehicle, sitting in the passenger seat, were taken into investigative detention. (JA 298). An inventory search of the vehicle revealed the existence of sixteen individually wrapped bags of crack cocaine. (JA 299, Govt. Ex. 30). Officer Smithley testified that this was consistent with further distribution. *Id.* Manning later had a conversation with Clements aboutcrack cocaine that was found in the car. (JA 331).

On March 25, 2004, Manning observed Smith at the Majik City nightclub in Newport News, Virginia and was, for the first time since October 2002, in a position to confront him. Manning allegedly opened fire on Smith's vehicle with a handgun, shooting and killing Smith and wounding Jason Sadler, a passenger in the vehicle.

## III. COGNIZABLE ISSUES UNDER 28 U.S.C. § 2255

The function of a §2255 Motion to Vacate, Set Aside or Correct Sentence is to inquire into the legality of the federal prisoner's detention. See *Heflin v. United States*, 358 U. S. 415, 421 (1959). Section 2255 provides four grounds that justify relief for a federal prisoner who challenges the imposition or length of his or her detention: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by

11

law"; or (4) "that the sentence is otherwise 'subject to collateral attack.'" 28 U. S. C. § 2255 (1994). Despite this apparently broad language, violations of federal law are only cognizable if they involve a "fundamental defect" resulting in a "complete miscarriage of Justice." *Davis v. United States*, 417 U. S. 333, 346 (1974).

Under Section 2255 of Title 28, United States Code, a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence on the ground that such sentence was illegally imposed. 28 U.S.C. § 2255(a). The statute further provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a "plausible" claim of ineffective assistance of counsel, not that "he will necessarily succeed on the claim." *United States v. Fulks*, 683 F.3d 512 (4th Cir.2012). Rule 4(b) of the Rules Governing § 2255 Proceedings further provides that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b), 281 U.S.C. foll. § 2255.

The procedure for determining whether a hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding. The petitioner's motion sets forth his or her legal and factual claims, accompanied by relevant exhibits: *e.g.*, an affidavit or declaration from the petitioner or others asserting relevant facts within their personal knowledge and/or identifying other sources of relevant evidence. Compare Rules Governing § 2255 Proceedings, Rules 2, 4(b), with Fed.R.Civ.P. 56(a)-(c); see also *Blackledge v. Allison*, 431 U.S. 63, 80-83(1977). The district court reviews those materials and relevant portions of the record in the underlying criminal proceeding. Compare Rules Governing § 2255 Proceedings, Rules 4(b), 8(a) with Fed.R.Civ.P. 56(c). The court then determines whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief. If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made.

The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions. See *Strickland v. Washington,* 466 U. S. 668 (1984). As such, ineffective assistance of counsel claims are cognizable in a §2255 setting because they are of constitutional dimension. See *Kimmelman v. Morrison,* 477 U.S. 365, 371-79 and n.3 (1986); *Strickland,* supra. The Sixth Amendment also

entitles a defendant to the assistance of counsel at every critical stage of a criminal prosecution. *Kirby v. Illinois,* 406 U.S. 682, 690 (1972). Critical stages are those steps of a criminal proceeding that hold significant consequences for the accused. See *Bell v. Cone,* 535 U.S. 685, 695-96 (2002). Thus, a defendant is entitled to counsel at any proceeding where an attorney's assistance may avoid the substantial prejudice that could otherwise result from the proceeding. See *Coleman v. Alabama,* 399 U.S. 1, 9 (1970).

To prevail on an ineffective assistance of counsel claim, Manning must show (1) that his "counsel's representation fell below an objective standard of reasonableness" and (2)"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984). The first *Strickland* requirement is commonly called the "performance" prong and the second is called the "prejudiced" prong. See *Strickland,* 466 U. S. at 687. Further, Manning must show that counsel's errors were prejudicial and deprived him of a "fair trial", or in other words, a trial whose result is reliable. *Id.*

The familiar two-part test of *Strickland* referenced above has been applied by the Supreme Court and the Fourth Circuit in a wide variety of contextual challenges to the effectiveness of counsel's performance in all phases of the

14

proceedings. *Id.* Defendants can raise ineffective assistance claims concerning performance before trial and during plea negotiation [*Lafler v. Cooper*, 132 S. Ct. 136 (2012); *Kimmelman v. Morrison*, 477 U.S. 365, 385(1986)]; performance during trial [*Strickland,* 466 U.S. at 686, 687]; assistance during sentencing [*Strickland,* supra; *Glover v. United States,* 531 U. S. 198 (2001)]; and performance on appeal [*Evitts v. Lucey,* 469 U. S. 387, 396 (1985)].

Upon granting a §2255 Motion, "[t]he court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him . . . or correct the sentence as may appear appropriate." 28 U. S. C. § 2255. See also, *Andrews v. United States*, 373 U. S. 334, 339 (1963).

# IV. GROUNDS FOR REVIEW

As a preliminary matter, it is respectfully requested that this Court be mindful that *pro se* litigants are entitled to liberal construction of their pleading *United States v. Wilson*, 699 F.3d 789 (4th Cir. 2012); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); and *Haines v. Kerner*, 404 U.S. 519 (1972).

## Argument

**A.**   **In light of *Lafler v. Cooper*, 132 S. Ct. 136 (2012), Manning's attorney was ineffective and his pretrial representation fell below the wide range of professional competence demanded by the Sixth Amendment by failing to attempt to negotiate a Plea Agreement which deprived him of effective assistance of pretrial counsel which would have avoided him receiving a life sentence.**

Manning's case is similar to the recent United States Supreme Court case of *Lafler v. Cooper*, 132 S. Ct. 136 (2012). In *Lafler,* Cooper shot a woman, striking her several times below the waist. He was arrested and charged with assault with intent to murder, possession of a firearm by a felon, and other charges. The state offered a plea bargain under which Cooper could plead guilty to the assault with intent to murder charge and face a minimum sentence of fifty-one to eighty-five months in prison.  Although Cooper was inclined to take the plea, his counsel advised him that, because the victim was injured below the waist, the state could not establish an element of its case, *i.e.*, intent to murder. Based on this erroneous

16

advice, Cooper rejected the deal. Cooper was later convicted at trial and received a sentence of between 185 and 360 months in prison.

In this matter in consideration of *Strickland*'s prejudice prong. The State and United States argued that, so long as the defendant has not been deprived a fair and reliable trial, there is no prejudice under *Strickland*. By contrast, Cooper argued that because plea bargaining is a critical stage of a criminal proceeding, the relevant inquiry is whether counsel's deficient performance affected the outcome of the plea process — the view uniformly applied by the lower courts.

In this present matter, Manning's trial counsel, Jon M. Babineau, Sr. ("Babineau") was ineffective. He failed to properly inform Manning of the real consequences of proceeding to trial. Because Manning had been acquitted in the State on these same charges, Babineau believed that he could win the federal trial. As such, Manning wholly relied on his attorney's advice and followed it.

After seeing the overwhelming evidence against Manning, Babineau had a duty and obligation to properly inform him of the probability that he would not win at trial and that if he lost, he would receive a life sentence. He was wholly ineffective in that he made absolutely no attempt to negotiate a favorable and reasonable Plea Agreement with the government on Manning's behalf that would have avoided a life sentence. He failed miserably in this way. Knowing that if

Manning was found guilty at trial that he would receive a life sentence, Babineau was wholly deficient in his performance and cannot meet any professional norm for such a deficiency. Manning was prejudiced because he was not fully informed of the consequences of his case. As in *Lafler*, Manning had the right for his attorney to at lease attempt to make an effort to have the government offer a reasonable plea which would have allowed him to not be sentenced to life imprisonment. It was Babineau's duty to make such an attempt and to convey any such offer to Manning. However, Babineau made no such effort and Manning proceeded to trial and received a life sentence. He was actually prejudiced by Babineau's acts and omissions. Had he inquired and negotiated a plea offer from the government, Manning could have avoided his life sentence.

Accordingly, Manning's conviction and sentence should be vacated.

**B.**     **Trial counsel provided ineffective assistance of counsel by moving the Court to substitute additional peremptory challenges during *voir dire* in exchange for Manning's silence concerning his State trial in which he was acquitted for murder and for which was being retried by this instant matter.**

Babineau filed a Motion for Additional Peremptory Challenges pursuant to Federal Rule of Criminal Procedure 24 and Local Rule 24 on January 24, 2011. Doc.138. In that motion, Babineau averred that most of the government's witnesses were testifying pursuant to plea agreements and/or have been granted immunity for

18

their testimony. He further noted that the fact that each defendant would likely be raising separate issues and distinct legal and factual defense to the present charges, as well as the nature of the charges. *Id.* Babineau requested fifteen (15) peremptory challenges during the *voir dire* phase of the trial. In its ruling the Court granted an additional five (5) peremptory challenges thus allowing a total of fifteen (15) for each defendant on Feb. 01, 2011. Doc. 142.

Whether the Court allowed one additional challenge or one hundred, Manning was actually prejudiced by the fact that he in no manner could point to, bring up, or allude to the fact that he was now being tried for a crime for which he was previously exonerated of by another jury. Although the appeals Court addressed this matter from both an immunity and double jeopardy standpoints, it did not address the effect on the jurors who were unaware of this matter. Manning still was not able to let the jury know and thus to consider the fact that Manning was found not guilty of the same charge by a South Carolina State court.

District courts and the appellate courts take a much narrower view than jury's do in such a matter and the only fair level playing field in regard to this question would have been to inform the jury both of the acquittal and the purported new evidence against Manning which came in the form of co-conspirators turning on Manning to save themselves a life sentence by cooperating with the

government. Since Double Jeopardy is prevented by the Constitution and because

the *voir dire* peremptory stage is not, Manning's attorney in effect traded an estate

for peanuts. The Supreme Court in *Rosales v. U.S.* 451 U.S. 182, 191(1981) stated:

> Determination of an appropriate nonconstitutional standard for the
> federal courts does not depend upon a comparison of the concrete
> costs and benefits that its application is likely to entail. These are
> likely to be slight: some delay in the trial versus the occasional
> discovery of an unqualified juror who would not otherwise be
> discovered. There is, however, a more significant conflict at issue
> here—one involving the appearance of justice in the federal courts.
> On the one hand, requiring an inquiry in every case is likely to create
> the impression "that justice in a court of law may turn upon the
> pigmentation of skin [or] the accident of birth." *Ristaino, supra*, 424
> U.S., at 596, n. 8, 96 S.Ct., at 1021, n. 8. Trial judges are
> understandably hesitant to introduce such a suggestion into their
> courtrooms.

Manning, being a black male in his twenties, was prone to have faced the

prejudice that most black males in this age bracket often do face in this country.

Considering that one in four black males between the ages of 25 and 30 are

incarcerated. Had the jury known that Manning had previously been exonerated of

the same crime for which he was being tried in this instant matter and for which

they were seated it is highly likely that Manning would have been exonerated in

this matter as well. Additionally, any of Manning's potential co-conspirators could

have gotten together after the South Carolina verdict and decided that someone had

to be the scapegoat or fall guy in the matter, thus forming a determination that

Manning would be the sacrificial lamb to save the rest of the co-conspirators and possibly to achieve a downward departure on charges they were at that time facing.

Accordingly, Manning's conviction and sentence should be vacated for a new trial.

**C.**   **The District Court erred by ordering that the defense would be allowed additional peremptory challenges in exchange for Manning's silence concerning his State trial in which he was acquitted for the same murder which was retried in this instant matter.**

On some matters it is imperative not to allow jurors to hear or have knowledge of certain intricate details of causes brought before them. In others, it is necessary in order to bring fairness and equality. This instant matter is a case of the latter. The Court and Babineau bartered Manning's defense. As a result of this bartering, Manning's freedom was put up for grabs. He lost out on his primary and best defense of the murder charge alleged against him. The court exchanged, granted, traded, or bartered by merely granting five (5) additional peremptory challenges to the defense in the *voir dire* process. Babineau had requested fifteen. Obviously, from Manning's legal standpoint it was a "take it or leave it" situation. However, Babineau should have strenuously objected and preserved such rejection to the Court's substitution of the peremptory challenges in exchange for the jury not being able to know of Manning's previous exoneration and not guilty verdict.

Such an exchange could in no way valued under any manner been equitable to the absence of that information being made known to the jury. Furthermore, the Court should not have made the order, especially when a jury verdict of guilty would cause Manning his freedom for a lifetime.

As noted in Ground B, immediately above, the government had requested that the Court order Babineau not to be able to allude to, describe, give notice in any form or by any means to the federal jury who heard this case of Manning's prior exoneration. Jurors' were not to know that Manning had been acquitted for the same crime two years prior in South Carolina as he was now being tried for in federal court.

In exchange for this silence, Babineau traded what seemed like a proverbial bowl of porridge, that being five (5) extra peremptory *voir dire* challenges for the most important and strongest evidence in Manning's defense. This paltry barter in no way compared to the fact that Manning had to keep silent about his previous exoneration of the same exact crime and actually prejudiced his cause. Somewhere during the course of Manning's trial, the Court *sua sponte* should have explained to the jurors that Manning had been found **not guilty** of murder by a previous jury but that the government had discovered new evidence that they contended proved Manning's guilt.

In the Supreme Court Case of *Rosales v. United States*, 451 U.S. 182, 189

(1981) the Court stated as thus:

> Because the obligation to impanel an impartial jury lies in the first
> instance with the trial judge, and because he must rely largely on his
> immediate perceptions, federal judges have been accorded ample
> discretion in determining how best to conduct the *voir dire*. "Special
> circumstances" under which the Constitution requires questioning
> prospective jurors about racial or ethnic bias exist only when racial
> issues are inextricably bound up with the conduct of the trial and there
> are substantial indications of the likelihood of racial or ethnic
> prejudice affecting the jurors in the particular case. See *Ristaino v.
> Ross*, 424 U.S. at 589; *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct.
> 848 35 L.Ed.2d 46. Under this Court's supervisory power over the
> federal courts, failure to honor a defendant's request to inquire into
> racial or ethnic prejudice, where such an inquiry is not constitutionally
> mandated, is reversible error only where the circumstances of the case
> indicate a "reasonable possibility" that such prejudice might influence
> the jury. Federal trial courts must make such an inquiry when
> requested by a defendant accused of a violent crime and where the
> defendant and the victim are members of different racial or ethnic
> groups. See *Ristaino, supra; Aldridge v. United States*, 283 U.S.
> 308, 51 S.Ct. 470, 75 L.Ed. 1054. Pp. 188-192.

In consideration of the jury not being able to know of Manning's previous

exoneration of murder, any court conducting a trial of black male in his twenties

should be cautious. Since one out of every four black males in the United States is

incarcerated, Manning in some aspects was prejudiced before the trial began.

Manning should have been able to request that the court assure that the federal

court jurors knew of his past exoneration and that there were racially prejudiced

23

jurors on the panel. Simply granting additional peremptory challenges, regardless of the number, does not eliminate prejudice. Manning, as noted above, as pointed out in the immediate ground above, was not informed of by the court or his attorneys of the fact that he could ask the court itself to ask of each citizen on the jury panel if they harbored any racism in their heart both in the past as well as in the present. Thus, Manning's right to a fair trial was duly prejudiced.

Accordingly, Manning's conviction and sentence should be vacated for a new trial.

## CONCLUSION

For the above and foregoing reasons, Manning's conviction and sentence should be vacated so that he can plead anew. In the alternative, it is respectfully requested that the Court grant an evidentiary hearing so that Manning may further prove his meritorious grounds, resolve facts in dispute and expand the record.

Respectfully submitted,

9/27/13

DATE:

Samuel Manning

SAMUEL MANNING
#57039-083
USP BIG SANDY
P. O. BOX 2068
INEZ, KY 41224
APPEARING *PRO SE*